[Cite as *State v. Velazquez*, 2018-Ohio-5068.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# ASHTABULA COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2018-A-0027** |
| JONATHAN VELAZQUEZ, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Ashtabula County Court of Common Pleas, Case No. 2017 CR 00069.

Judgment: Affirmed.

*Nicholas A. Iarocci,* Ashtabula County Prosecutor, and *Shelley M. Pratt,* Assistant Prosecutor, Ashtabula County Courthouse, 25 West Jefferson Street, Jefferson, OH 44047 (For Plaintiff-Appellee).

*Christopher J. Boeman,* P.O. Box 583, Willoughby, OH 44096 (For Defendant-Appellant).

CYNTHIA WESTCOTT RICE, J.

{¶1} Appellant, Jonathan Velazquez, appeals from the judgment of the Ashtabula County Court of Common Pleas convicting him, after a trial by jury, on one count of endangering children. At issue is whether the conviction is supported by sufficient evidence as well as the manifest weight of the evidence. We affirm.

{¶2} On the morning of February 6, 2014, Patrolman Derrick T. Yopp of the Geneva Police Department received a report relating to an injured, three-month-old

child, M.V., who had been transported via ambulance to Rainbow's Babies and Children Hospital ("Rainbow's") in Cleveland. The officer arrived at the hospital and was greeted by the treating physicians, nurses, and social service workers. He further spoke with M.V.'s father, appellant, and her mother, Emily Klco.

{¶3} When asked how his daughter was injured, appellant explained that, around 3:30 p.m. on the previous day, the child was laying on the floor for tummy time when her two-year-old sister, A.V., tripped and fell on the baby. He further noted when A.V. tried to stand up, she fell on M.V. again. The baby began to cry. Appellant was sitting on the couch at the time and quickly tended to the child. She stopped crying and he took M.V. and laid her down for a nap. He subsequently texted Ms. Klco at work to advise her A.V. had fallen on M.V. He later noticed a small amount of swelling on the child's head. Appellant maintained he did nothing to cause M.V.'s injuries and could offer no other explanation for them other than A.V. falling on the baby.

{¶4} Ms. Klco had gone to work that morning at approximately 11:30 a.m. and arrived home around 4:30 p.m. When she returned from work, Ms. Klco thought there was something wrong with M.V. She observed swelling on the baby's left side, noticed the child was pale, and that her eyes deviated to the left. Ms. Klco called 911 and an ambulance was dispatched. Ms. Klco stated she had changed M.V.'s diaper prior to going to work and did not notice anything unusual with the child.

{¶5} M.V. was transported to a hospital in Geneva where she was diagnosed with a subdural hematoma and a skull fracture. She was then transferred to Rainbow's where she received care in the hospital's emergency room and pediatric critical care unit. M.V. was intubated, placed on a ventilator, and a pressure-monitoring device was

2

placed in her brain. Dr. Anne Stormorken began treating M.V. and believed the injuries were life threatening. The doctor noted there was blood between the skull and the brain on the left side underneath the fracture. There was bleeding on the opposite side of the skull fracture on the right side of the brain between the skull and the brain. And a pressure monitor indicated significant brain swelling. The child was given medication to minimize swelling and help with seizures.

{¶6} Dr. Stormorken was advised of the purported cause of M.V.'s injuries. Given the extent of the injuries to the child's skull and brain, she testified, to a reasonable degree of medical certainty, that the damage to M.V. could not have been caused by a two-year-old falling on the baby. Instead, she opined the injuries were more likely caused by acceleration and deceleration injury while M.V.'s head was moving. And, because there was blood between the skull and brain on the left side underneath the fracture, as well as bleeding on the opposite side of the skull fracture between the brain and skull, she asserted the acceleration/deceleration caused the brain to strike against the skull creating a coup counter coup injury. She emphasized an impact injury to one side of the head would not create the type of injury from which M.V. suffered.

{¶7} Dr. Stormorken also noted that M.V. had rib fractures. There were fractures on the right side of her chest to ribs three through six and on the left side of her chest to ribs two through six. On the left, back side, ribs eight and nine were fractured. These injuries showed signs of healing and therefore Dr. Stormorken concluded they occurred prior to the head injuries.

{¶8} In addition, Dr. Stormorken referred M.V. to a sexual assault nurse because the Gonorrhea bacteria was found in M.V.'s bodily fluids. The child did not test positive for sexually transmitted diseases; the nurse, however, reported small rectal tears.

{¶9} M.V. was ultimately removed from the ventilator. M.V. still suffers from profound developmental delays, seizures, poor muscle tone, and has difficulty swallowing, causing frequent aspiration pneumonias.

{¶10} Detective Mike Rose, formerly of the Ashtabula County Sheriff's Department, assisted in the investigation of the injury. Approximately two months after the incident, Det. Rose interviewed appellant. Appellant stated he was the only adult in the home when the incident occurred and that both M.V. and A.V. were under his care while Ms. Klco was working. He maintained A.V. fell on M.V. and, while M.V. cried after the incident and had a lump on her head, he did not believe the child suffered any serious injuries. Appellant stated M.V. appeared to be sleepy after the incident so he put her down for a nap. M.V. made some unusual noises while sleeping, but he was not particularly concerned. After Ms. Klco returned home, M.V. made a "weird" noise and, given the circumstances, she decided to call 911. Appellant advised the detective that he understood the situation looked strange from the outside. He also acknowledged that, as the caregiver, he was responsible for any injuries the child suffered.

{¶11} Appellant was ultimately indicted on one count of rape, in violation of R.C. 2907.02(A)(1)(b) and R.C. 2971.03(B)(1)(b), a felony of the first degree; one count of sexual battery, in violation of R.C. 2907.03(A)(5)(B), a felony of the second degree; two counts of felonious assault, in violation of R.C. 2903.11(A)(1), a felony of the second

4

degree, with one specification stating the assault was committed with a sexual motivation, pursuant to R.C. 2941.147; one count of endangering children, in violation of R.C. 2919.22(B)(1), a felony of the second degree, with a specification that the offense was committed with a sexual motivation, pursuant to R.C. 2941.147; one count of endangering children, in violation of R.C. 2919.22, a felony of the third degree; and one count of domestic violence, in violation of R.C. 2919.25, a misdemeanor of the first degree. All offenses were alleged to have occurred between January 1, 2014 and February 5, 2014 and the alleged victim in each count was appellant's daughter, M.V. Appellant pleaded not guilty.

{¶12} A jury trial commenced. At the conclusion of the state's case-in-chief, defense counsel made a Crim.R. 29 motion for acquittal. The trial court granted the motion as to the rape count and one of the felonious assault counts. At the end of the defense's case, the motion was re-newed and the trial court granted the motion as it related to the sexual motivation specification of the endangering children count. After deliberations, the jury acquitted appellant of felonious assault with a sexual motivation specification, felony-two endangering children, and domestic violence. The jury returned a verdict of guilty on the felony-three endangering children count. The matter proceeded to sentencing and, after a hearing, appellant was sentenced to a two-year term of community control and forty hours of community service. He now appeals and assigns the following as error:

{¶13} "The verdict is against the manifest weight of the evidence and the sufficiency of the evidence."

{¶14} A "sufficiency" argument raises a question of law as to whether the prosecution offered some evidence concerning each element of the charged offense. *State v. Windle,* 11th Dist. Lake No. 2010-L-0033, 2011-Ohio-4171, ¶25. "[T]he proper inquiry is, after viewing the evidence most favorably to the prosecution, whether the jury could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Troisi,* 179 Ohio App.3d 326, 2008-Ohio-6062, ¶9 (11th Dist.).

{¶15} In contrast, a court reviewing the manifest weight observes the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Schlee,* 11th Dist. Lake No. 93-L-082, 1994 WL 738452, *4-5 (Dec. 23, 1994).

{¶16} Appellant was convicted of endangering children, in violation of R.C. 2919.22(A)(E)(2)(C), which provides:

{¶17} (A) No person, who is the parent * * * of a child under eighteen years of age * * * shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support.

{¶18} * * *

{¶19} (E)(1) Whoever violates this section is guilty of endangering children

{¶20} (2) If the offender violates division (A) or (B)(1) of this section, endangering children is one of the following

{¶21} * * *

{¶22} (c) If the violation is a violation of division (A) of this section and results in serious physical harm to the child involved, a felony of the third degree.

{¶23} Appellant first asserts the state failed to show that appellant suffered the brain injury while appellant was her caregiver. We do not agree.

{¶24} Appellant specifically testified that when Ms. Klco was out of the house, he was M.V.'s and A.V.'s caregiver. And, on February 5, 2014, Ms. Klco left for work at approximately 11:30 a.m. and returned home at approximately 4:30 p.m. Accordingly, appellant was the sole caregiver of the children during this timeframe.

{¶25} Moreover, Ms. Klco testified that, prior to leaving for work, she changed the baby's diaper and noticed nothing unusual in her behavior or appearance. She stated M.V. did not show any signs of bruising or any cuts. Upon returning home from work, Ms. Klco testified she checked on the baby and noticed some swelling to the left side of M.V.'s head. She also stated M.V. was unusually pale and her eyes deviated to the left. Upon arriving at the hospital, doctors determined M.V. suffered from a skull fracture and a subdural hematoma. In fact, there was blood between M.V.'s skull and brain on the left side underneath the fracture, as well as bleeding on the opposite side of the skull fracture between the brain and skull.

{¶26} Moreover, Dr. Lolita McDavid, Medical Director of Child Advocacy and Protection at Rainbow's, evaluated M.V. upon her arrival at the hospital. She testified she met with Ms. Klco to find out if M.V. had any previous medical issues. Ms. Klco confirmed that, prior to February 5, 2014, M.V. had a normal developmental history with no significant medical conditions prior to the incident.

**{¶27}** The foregoing suggests M.V. was not injured prior to Ms. Klco leaving for work on February 5, 2014, but the baby was seriously injured upon her return from work. This, in conjunction with appellant's explanation of how the injury occurred, i.e., A.V. falling on M.V. while the latter was laying on the floor, provided sufficient, credible evidence for a jury to conclude that M.V. suffered the brain injury while appellant was her caregiver on February 5, 2014.

**{¶28}** Next, appellant argues the state failed to establish, beyond a reasonable doubt, that appellant acted recklessly. Appellant contends his decision to permit M.V. to remain on the floor while A.V. was running through the home does not rise to the level of a reckless act.

**{¶29}** "[T]he culpable mental state of recklessness is an essential element of the crime of endangering children." *State v. Adams*, 62 Ohio St.2d 151 (1980), paragraph one of the syllabus. R.C. 2901.22(C) provides: "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature."

**{¶30}** Dr. Stormorken testified she did not believe M.V.'s injuries were caused by A.V. falling on her because the profound severity of the injuries. She maintained it was unlikely the baby's injuries were a result of an impact injury. Instead, she testified the injuries were more likely a consequence of an acceleration and deceleration injury that would have occurred when the child's head was moving. Indeed, she testified it was not possible that the injuries were caused by a child tripping and falling on her while laying on a blanket on a carpeted floor. Similarly, Dr. McDavid testified M.V.'s injuries were life

8

threatening and not consistent with the explanation provided by appellant. She noted that siblings fall on each other all the time and such significant injuries are not present. Hence, Dr. McDavid testified that, based upon her training and experience, M.V.'s injuries were not caused by a two-year-old tripping and falling on her.

{¶31} Alternatively, appellant offered the testimony of Dr. Janice Ophoven as an expert. Dr. Ophoven is a specialist in pediatric forensic pathology. Dr. Ophoven did not examine M.V., but reviewed her medical records. She testified that M.V.'s injuries could be consistent with appellant's version of events. To wit, the doctor stated:

{¶32} "To a reasonable degree of medical certainty, could a thirty pound toddler impacting the head of a three month old baby whose head is on the floor, result in a crush injury leading to brain swelling, increase and cranial pressure, and brain damage with a fracture, the answer is absolutely yes."

{¶33} The jury heard the foregoing, competing medical testimony. If it elected to believe Drs. Stormorken and McDavid, it could have concluded that M.V.'s injuries were not a result of A.V. falling on the child, but, instead, were a function of the baby's head rapidly accelerating and then decelerating to create a situation where her brain bounced from one side of her skull to the to the other causing the brain to bleed on either side of the head. There simply is no dispute regarding the severity of the injuries to M.V. By appellant's own admission, and the testimony of Ms. Klco, M.V. was fine when Ms. Klco left for work. And the severe injuries resulted in symptoms that appellant recognized while M.V. was in his care. Because there was sufficient, credible evidence that appellant was the child's caretaker during the time the injury occurred, the jury could also conclude that, at some point, appellant was the agent that caused the child to

9

suffer the injury in the manner described by Drs. Stormorken and McDavid. If so, the jury could conclude that appellant, on the day in question, caused the baby's head to rapidly accelerate, then decelerate and thereby acted with heedless disregard to the consequences, ignoring the substantial risk that severe injury was likely to result.

{¶34} Moreover, even if the jury chose to believe appellant's version of events, it could still draw the inference he acted recklessly. Specifically, Det. Rose testified that, during his interview, appellant described what occurred on the date of the incident. According to appellant, A.V. had a standard nap time from 3:30 p.m. to 5:30 p.m. When A.V. is told it is nap time, appellant disclosed that she goes "berserk," running around, back and forth. And, on the date of the incident, appellant described A.V. running in a semi-circle around a section of the couch near the area where M.V. was laying on the floor. And, at some point, A.V. either tripped or jumped on M.V. and, as she attempted to stand, A.V. again fell on the baby.

{¶35} By allowing M.V. to lay on the floor, with an acknowledged awareness that A.V. goes "berserk," running through the house whenever she is informed that it is nap time, a jury could reasonably conclude that appellant acted with heedless indifference to the consequences and disregarded a substantial and unjustifiable risk of A.V. falling upon the baby.

{¶36} Accepting appellant's explanation of how M.V.'s injuries occurred, a jury could conclude appellant violated a duty of care to the baby thereby recklessly creating a substantial risk to her safety. We therefore conclude the conviction is supported by both sufficient evidence and the manifest weight of the evidence.

{¶37} Appellant's assignment of error lacks merit.

10

{¶38} For the reasons discussed in this opinion, the judgment of the Ashtabula County Court of Common Pleas is affirmed.


TIMOTHY P. CANNON, J., concurs,

COLLEEN MARY O'TOOLE, J., dissents.