[Cite as *State v. Doak*, 2020-Ohio-66.]

# IN THE COURT OF APPEALS

## ELEVENTH APPELLATE DISTRICT

## PORTAGE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2018-P-0022** |
| RICHARD B. DOAK, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Portage County Court of Common Pleas, Case No. 2017 CR 00417.

Judgment: Affirmed in part, reversed in part, and remanded.

*Victor V. Vigluicci,* Portage County Prosecutor, and *Theresa M. Scahill,* Assistant Prosecutor, 241 South Chestnut Street, Ravenna, OH 44266 (For Plaintiff-Appellee).

*Edward M. Heindel,* 2200 Terminal Tower, 50 Public Square, Cleveland, OH 44113 (For Defendant-Appellant).

CYNTHIA WESTCOTT RICE, J.

{¶1} Appellant, Richard B. Doak, appeals from the judgment of the Portage County Court of Common Pleas, after trial by jury, convicting him of rape. We affirm in part, reverse in part, and remand.

{¶2} On April 19, 2016, S.A. ("mother"), mother of the victim, I.A. (d.o.b. January 24, 2009), left her three children at home with Jason Williams, her live-in boyfriend, while she went to work. The children included I.A., I.A.'s sister, and I.A.'s half-brother. The

home is located in Ravenna Township, Portage County, Ohio. While Mr. Williams was doing house work, appellant, mother's uncle, arrived at the residence. When appellant entered the home, Mr. Williams noticed a pronounced odor of alcoholic beverage emanating from him. Appellant asked if he could take I.A. out to his truck. Mr. Williams stated he was uncomfortable with granting the request and declined; appellant made several more requests and when appellant suggested they would only be five or so minutes, Mr. Williams ultimately acceded. After appellant left the home with I.A., Mr. Williams went to the restroom and, upon glancing outside, noticed appellant, I.A., and the truck were gone. He immediately called mother, who called the police. Mr. Williams also contacted I.A.'s maternal grandmother (appellant's sister), Valerie Pantalone, and I.A.'s aunt, Ashley Pantalone.

{¶3} Portage County Sherriff Deputy Justin Herrera received a call from the Ravenna Police Department regarding an abducted child. He arrived at the Ravenna Police Department and met with the grandmother and aunt, who explained what had occurred and provided the officer with a picture of I.A. Deputy Herrera then drove to the home where he met with Mr. Williams; the officer was also joined by Portage County Sherriff Dep. Matthew Daily. The deputy stated the department was prepared to issue a "BOLO" (Be On the Look Out) to other departments, as well as an Amber alert. While speaking with Mr. Williams, appellant returned to the home with I.A. They had been gone between an hour and a half and two hours.

{¶4} Appellant was ordered out of the truck and Dep. Herrera approached the passenger side where I.A. was sitting. He noted that she was crying and trembling. The child told the officer that appellant was mean to her and that she repeatedly asked

2

appellant to take her home but he would not. After returning I.A. to her mother and family, Dep. Herrera rejoined Dep. Dailey outside. The deputies engaged appellant and noticed he appeared intoxicated: he had a strong odor of alcohol on his breath, he was swaying, and he had slurred speech. Appellant was asked to perform field sobriety tests, which he declined; he also declined a BAC test. Appellant was ultimately arrested for OVI and additionally charged with child endangering.

{¶5} The deputies returned to their department where they conferred with Lieutenant Gregory Johnson. Lt. Johnson recommended that, given the circumstances of the report and arrest, Dep. Dailey return to the home and collect the clothing I.A. was wearing while she was with appellant. He subsequently went back and acquired I.A.'s clothing and placed it in an evidence bag.

{¶6} I.A. was given a bath later that evening. Her Aunt Ashley assisted mother with the bath while the child's grandmother looked on. None of the women noticed any visible injuries on the child. While she was being bathed, however, the child stated appellant "stuck his hand on her hard down there." She would not go into additional details when asked about the comment.

{¶7} The day after the incident, I.A. had an appointment with her counselor, Jennifer Anders. Ms. Anders had been seeing I.A. since November 2015 due to certain inappropriate behavior which occurred between I.A. and a fellow student. Mother advised Ms. Anders of the incident and reported that appellant had hit I.A. on her thigh. According to Ms. Anders, I.A. confirmed this happened, but did not wish to discuss the matter further. Nothing more was said about the incident for some eight months.

3

{¶8} In December 2016, mother was with her two daughters at home when I.A. disclosed that, while visiting her father in Summit County, one of her step brothers made a "love connection" with her. When pressed about what she meant, she indicated the two had "sex." I.A. was subsequently taken to the Children's Advocacy Center ("CAC") in Portage County where she met with Nurse Melinda Andel.

{¶9} Nurse Andel is a Pediatric Sexual Assault Nurse Examiner and assists families and children who are referred to CAC for concerns of sexual abuse. Nurse Andel stated CAC is a nonprofit, multi-disciplinary organization that coordinates prosecution, law enforcement, child protective services, mental health, medicine, and child advocacy. She stated, upon receiving a referral, she will interview parents or caregivers to obtain a child's medical history and obtain any information the parents possess regarding potential abuse. After speaking with the parents or caregivers, Nurse Andel will conduct a medical examination of the child to determine whether there is any physical evidence of abuse and to ensure the child is not medically compromised. She then conducts an interview with the child, which is recorded. In the course of an interview, Nurse Andel stressed her major concern is to determine whether sexual abuse occurred; and, through the medical information as well as the child's statements, Nurse Andel can properly assess how to diagnose and treat the child and determine what interventions are necessary. In order to accomplish these goals, Nurse Andel stated she builds a rapport with the child, letting him or her know she is a nurse whose goal to ensure the child is healthy and safe.

{¶10} Upon commencing her interview with I.A., Nurse Andel was able to elicit information regarding a sexual encounter the child had with her step brother. In the course of describing how the encounter occurred, I.A. spontaneously disclosed she had

4

a similar encounter with an adult, who she later identified as appellant. I.A. stated she had "never told a single person," but that appellant had "sex" with her in a men's bathroom at a park. I.A. demonstrated how she was positioned when it happened (laying on her back) and how appellant accomplished the act (on top of her, thrusting with the pelvis). She stated appellant inserted his penis into her vagina and "peed" on her when the incident concluded.

{¶11} Portage County Department of Job and Family Services ("PCDJFS") was notified of the new allegation and it notified the Portage County Sheriff's Office. CAC sent the Sheriff's Office a narrative of what was disclosed as well as a DVD recording of the interview between I.A. and Nurse Andel. Deputy Marsha Zwick reviewed the information and DVD and ultimately contacted appellant, who agreed to come into the office for an interview. Appellant confirmed he took I.A. to the park on April 19, 2016, but denied any inappropriate conduct. Appellant stated that, while they were at the park, I.A. needed to use the bathroom. He asserted he looked into the men's bathroom to make sure no one was inside, ushered the child in, and stood guard while she used it. At the conclusion of the interview, a sample of appellant's DNA was taken. Dep. Zwick also obtained a sample of I.A.'s DNA and sent each sample along with I.A.'s clothing from the day of the incident to Ohio Bureau of Criminal Investigation ("BCI").

{¶12} BCI forensic DNA analyst Halle Dreyer analyzed DNA swabs taken from the inside of I.A.'s underwear and found a mixture of DNA. I.A. was the major contributor of the DNA found on the clothing. And, even though there was a relatively significant amount of male DNA (three nanograms), the predominance of I.A.'s DNA served to "mask" the male profile. She further noted, however, that appellant could not be excluded as a male

5

contributor to the DNA found. Ms. Dreyer concluded that the male DNA profile found in the underwear was consistent with appellant and estimated the rarity of the profile is one in 700. She also noted that the presence of three nanograms of male DNA found in the underwear would be inconsistent with a coincidental transfer of DNA onto the clothing.

{¶13} Appellant was indicted on one count of rape, in violation of R.C. 2907.02(A)(1)(b) and (B), a first-degree felony; and one count of gross sexual imposition, in violation of R.C. 2907.05(A)(4) and (B), a third-degree felony. Appellant pleaded not-guilty. After a competency hearing, I.A. was determined competent to testify. The court additionally held a hearing, pursuant to *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, to determine whether the video of an interview that had taken place at CAC was admissible and non-violative of the Confrontation Clause. The court determined the statements made by I.A. to Nurse Andel, while hearsay, were made for medical diagnosis and treatment and, furthermore, were nontestimonial. Thus, the court concluded the statements were admissible.

{¶14} The matter proceeded to a jury trial after which appellant was found guilty of both rape and gross sexual imposition. With respect to the rape count, the jury made the additional finding that the victim was less than 10 years old at the time of the offense. Regarding the gross sexual imposition count, the jury also found the victim was less than 13 years old at the time of the offense. The court referred the matter to the adult probation department for a pre-sentence investigation ("PSI") and report. At the sentencing hearing, the trial court found that the gross sexual imposition count merged with the rape count. The trial court sentenced appellant to life imprisonment without parole eligibility for the rape offense. Notwithstanding the merger, the court also sentenced appellant to five-

6

years imprisonment for the gross sexual imposition count and ordered the terms to be served concurrently. The court also found appellant was a tier III sex offender/child-victim offender and notified him of his registration requirements. He now appeals and assigns four errors for our review. For ease of discussion, appellant's first and second assignments of error will be addressed together. They provide:

{¶15} "[1.] The convictions were against the manifest weight of the evidence.

{¶16} "[2] There was insufficient evidence against Doak."

{¶17} A "sufficiency" argument raises a question of law as to whether the prosecution offered some evidence concerning each element of the charged offense. *State v. Windle,* 11th Dist. Lake No. 2010-L-0033, 2011-Ohio-4171, ¶25. "[T]he proper inquiry is, after viewing the evidence most favorably to the prosecution, whether the jury could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Troisi,* 179 Ohio App.3d 326, 2008-Ohio-6062, ¶9 (11th Dist.).

{¶18} Alternatively, "a court reviewing the manifest weight observes the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Velazquez*, 11th Dist. Ashtabula No. 2018-A-0027, 2018-Ohio-5068, ¶15 citing *State v. Schlee,* 11th Dist. Lake No. 93-L-082, 1994 WL 738452, *4-5 (Dec. 23, 1994). "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus.

{¶19} Appellant argues the state failed to meet its burdens of production and persuasion on both the rape and the gross sexual imposition counts. We must point out the trial court merged these counts. Moreover, during the sentencing hearing, the prosecutor conceded the counts should merge and made a recommendation that the court either sentence appellant to life imprisonment without the possibility of parole or life imprisonment with the possibility of parole in 15 years on the rape count. We shall treat this recommendation as an election and, given this construction, there was no conviction on the gross sexual imposition count.[1] We shall therefore proceed to analyze appellant's sole conviction of rape to determine whether the state met its burdens.

{¶20} Appellant was convicted of rape, in violation of R.C. 2907.02(A)(1)(b), which provides: "No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." Vaginal intercourse is a form of sexual conduct. R.C. 2907.01(A). "Penetration, however slight, is sufficient to complete vaginal * * * intercourse." *Id.*

{¶21} Appellant first contends his conviction was based on insufficient evidence or, alternatively, against the manifest weight of the evidence because there were no scratches or marks on I.A.'s body after the incident. A sexual assault does not automatically require visible physical trauma. Moreover, even though the assault occurred in a public restroom on a concrete floor, photos of the restroom show the floor was

---

1. In this respect, the trial court's entry of conviction on the gross sexual imposition count is void. This issue will be addressed in greater detail infra.

constructed of smooth concrete. Physical scratches and the like would not necessarily appear on a smooth surface.

{¶22} Moreover, Nurse Andel testified that, occasionally, if something has gone inside the vagina, a transection, or tear, is visible. She emphasized, however, such injuries heal quickly and, within a very short time, there would be no visible evidence of an injury. And, with respect to child sexual abuse, an examination would have to occur within 72 hours to reveal physical injuries. She also testified that, under some circumstances, even where there is penetration, a child victim may sustain no injury at all due to the moist and elastic nature of the tissue. Dr. Paul McPherson, a specialist in child-abuse pediatrics, echoed Nurse Andel's testimony. The lack of any physical scratches, marks, or injuries does not militate heavily against the rape conviction.

{¶23} Next, appellant argues that despite I.A.'s statement that he peed on her, there was no semen or urine on her clothes. I.A. stated, in her interview, that after appellant assaulted her, he peed on her. Dr. McPherson testified that, when a child reports that someone peed on them, it could be either ejaculation or urination. Even though there was no evidence of semen found on the child's clothing, this does not provide a basis for the inference that the incident did not occur. To the contrary, one could reasonably infer, to the extent appellant ejaculated or urinated on I.A. after the assault, he did not do so on her clothing. Under these circumstances, any evidence could be wiped away with no trace of the fluids to test.

{¶24} Appellant additionally asserts that because I.A. was subjected to sexual activity by other family members, she may have confused the incidents. During the interview with Nurse Andel, I.A. stated that she and an adult had sex; she later stated the

9

adult was her uncle, but she could not remember his name. Later still, she indicated the perpetrator was her great uncle. And, finally, when discussing what her step brother had done with her, she stated "Uncle Richard" did the same thing. Moreover, appellant does not dispute he took I.A. to the park on the day in question and he took her to the restroom in the park where I.A. stated the sexual conduct took place.

{¶25} The jury was free to find I.A.'s statement, given its details and the manner in which she spoke about the incident, credible; and, this credibility was bolstered by BCI forensic DNA analyst Halle Dreyer's testimony. Ms. Dreyer stated she found three nanograms of male DNA on I.A.'s underwear. Although she could not precisely identify the bodily source from which the DNA profile issued (because of the extreme prevalence of I.A.'s DNA in the sample had the effect of masking or diluting the male DNA), she testified three nanograms is a remarkably large amount and cannot be a result of a casual transfer. In the case of a casual transfer, she testified she would expect to see 0.1 to 0.5 nanograms of DNA. Further, appellant could not be excluded from the male DNA profile; indeed, Ms. Dreyer testified, the profile was consistent with appellant's DNA profile with an estimated rarity of that profile of one in every 700. Although appellant could not be conclusively identified, statistically speaking, this result excludes 699 out of 700 individuals.

{¶26} Also, when explaining the association of the DNA profile in the underwear to appellant's DNA, Ms. Dreyer testified:

{¶27} So what a DNA profile looks like, imagine if you've ever seen anybody hooked up to a heart monitor, lines going across the bottom of the screen, the heart beats, it shoots up and it comes back down, that's what a DNA profile looks like. And where that line shoots up is an indicator of what that person's profile is at that location.

{¶28} What we do is we have that on a sheet of paper and we're looking at 25 different areas of DNA. So essentially we're seeing that line shoot up 25 different times which tells me what the profile is.

{¶29} What I do is make a comparison to what is the profile at that location on the evidence and I'll compare it directly to what is [appellant's] profile at that same location. And if it's a match, if it's consistent with each other, then I move on to the next location.

{¶30} In this instance, at 24 out of 25 locations, the profile was consistent between the evidence and the profile for [appellant].

{¶31} The 25th location, the peek was just below our reporting threshold, so it didn't meet the criteria for me to include it * * *.

{¶32} The foregoing provided the jury with a sufficient, credible basis to conclude appellant was the perpetrator and I.A.'s statement regarding the incident was not based upon confusion, notwithstanding the separate alleged assault(s) the child endured.

{¶33} Finally, appellant suggests that the length of time between the incident and I.A.'s disclosure of the assault militates against the jury's verdict. Appellant points out I.A. had ample opportunities to report the incident to her family, as well as her counselor, who visited the child the day after the incident. Instead, she waited some eight months to communicate the assault to a third party. While the delayed disclosure is an important consideration in weighing I.A.'s allegation, the testimony of both Nurse Andel and Dr. McPherson provided a compelling explanation for the delay.

{¶34} Nurse Andel testified it is very common for individuals not to disclose sexual assaults immediately; and, according to her, research indicates that individuals very often never disclose such events. Nurse Andel provided additional context in relation to the interview she conducted with I.A. When asked if she was surprised by I.A.'s delayed disclosure, the nurse testified she was not, and elaborated:

{¶35} Because when I look at the two experiences [I.A.] was talking about here, okay, she disclosed readily to her mom about something that happened with similar age children that she considered a game, okay. So it didn't surprise me that she was able to talk about that. She didn't understand it. You know, so when she's talking to her mom she tells her about this love connection thing with - - that was a game with similar age children. But, you know, when a child - - when something happens with a trusted adult or family member, sometimes it's much more difficult for a child to talk about that. They don't understand it. They know that usually isn't a game.

{¶36} Furthermore, Dr. McPherson testified:

{¶37} So, in [I.A.'s] case, the fact that the disclosure about the sexual abuse by an adult family member occurred months afterwards is actually the norm or usual in child sexual abuse cases when you have an adult who is a trusted caregiver, a family member. That always seems unusual to people. But in studies that have been done by Researcher Elliott in 1994 and the Dr. Carol Jenny and her textbook on child abuse, they talk about how up to 50 to 75 percent of children will delay their disclosure of child sexual abuse by up to a year and up to 15 percent may delay disclosure five years and beyond. And when we ask adult women were they ever sexually abused as a child and did they ever tell someone about that abuse, up to a third or a half of adult women say they never told anyone. And so while we would want these children, especially young children, to tell us right away, in actuality, they delay that disclosure. So it wasn't surprising to me at all, both from a clinical perspective, having evaluated 1,500 children, but also from the medical literature, and my understanding in childhood development.

{¶38} With the foregoing expert testimony in mind, I.A.'s delayed disclosure of the incident would be reasonable, especially because the assault involved a family member, and thus does not weigh significantly against the jury's verdict.

{¶39} The state presented sufficient, credible evidence that appellant engaged in sexual conduct, via vaginal penetration, with I.A., who was less than 10 years old at the time of the incident. We therefore hold the state met both its burden of production and persuasion to convict appellant of rape, in violation of R.C. 2907.02(A)(1)(b).

{¶40} Appellant's first and second assignments of error are without merit.

12

{¶41} Appellant's third assignment of error provides:

{¶42} "The state engaged in improper closing argument."

{¶43} In reviewing a claim of prosecutorial misconduct, a court must determine whether the challenged statements were improper, and if so, whether the remarks affected the defendant's substantial rights. *State v. Smith,* 87 Ohio St.3d 424, 442 (2000). A conviction will not be reversed because of prosecutorial misconduct, however, unless it so taints the proceedings that a defendant is deprived of a fair trial. *Id.* In evaluating conduct, we are mindful that prosecutors are granted wide latitude in closing arguments. *State v. Rahman*, 23 Ohio St.3d 146, 154 (1986). Furthermore, this court will consider the effect of any improper statement in the context of the entire trial. *State v. Keenan*, 66 Ohio St.3d 402, 410 (1993).

{¶44} Appellant did not object to any of the prosecutor's statements; we accordingly review the arguments under a plain error standard. To establish plain error, appellant must demonstrate: (1) there was an error; (2) the error was obvious; and (3) the error affected his substantial rights. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). A reversal on the ground of plain error is not warranted unless "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph two of the syllabus.

{¶45} Appellant identifies three categories of allegedly improper statements advanced by the prosecutor: (1) expression of a personal opinion regarding witness credibility; (2) comments regarding appellant's decision to remain silent; and (3) alleged appeals to God. He provides various quotes, taken from the state's closing argument, but fails to advance arguments how the alleged errors are obvious, let alone clearly

13

discuss how they affected his substantial rights. After setting forth the law relating to prosecutorial misconduct and citing cases which he presumably finds analogous, he simply draws the conclusions that: (1) a prosecutor can comment upon witness credibility, but may not express his or her opinion; (2) the prosecutor's comments on appellant's silence rendered the trial fundamentally unfair; and, (3) references to God, appealing to a "higher power," are unwarranted and "just plainly improper." As appellant fails to fully engage in the plain error analysis, his arguments lack merit. In the interest of justice, however, we shall address appellant's points in turn.

{¶46} An attorney should avoid expressing personal beliefs or opinions with respect to the guilt of the accused, as well as the credibility of witnesses. *State v. Lott*, 51 Ohio St.3d 160, 166 (1990). This is particularly true in the case of a prosecutor in a criminal case. *Rahman*, *supra.* That said, it is not improper for a prosecutor to comment on the evidence in his closing argument and to state the appropriate conclusions to be drawn therefrom. Accordingly, a prosecutor may comment *fairly* on a witness' credibility based upon his or her in-court testimony. *State v. Keene,* 81 Ohio St.3d 646, 666 (1998). "Prosecutors[, however,] may not invade the realm of the jury by, for example, stating their personal beliefs regarding guilt and credibility, or alluding to matters outside the record." (Internal citations omitted.) *State v. Baker,* 159 Ohio App.3d 462, 2005-Ohio-45, ¶19 (2d Dist.)

{¶47} Appellant first points to an aspect of the closing argument where the prosecutor is reviewing the testimony of I.A.'s aunt and grandmother. Both I.A.'s grandmother and her aunt were present during I.A.'s bath following the incident. I.A.'s aunt testified that appellant "stuck his hand on her hard down there." I.A.'s grandmother

14

did not relay this statement during her testimony. It is within this context that the prosecutor stated he "was shocked when [I.A.'s aunt] said what she said." This was a comment upon the evidence and did not urge the jury to draw any specific conclusion. We do not deem the prosecutor's statement in any way problematic.

{¶48} The prosecutor also noted appellant is the brother of I.A.'s grandmother. He stated that "it's her brother, she probably doesn't want to believe he did this and she's gonna get up there on the stand and testify in a way that she believes, because she believes her brother." It was in this context that the prosecutor stated he did not "fault [I.A.'s grandmother] because I think [she] believes her own lies." Characterizing I.A.'s grandmother as one who lies is problematic because the assessment reflects the prosecutor's personal opinion regarding her credibility. Nevertheless, I.A.'s grandmother testified that when she found out appellant, who had been drinking, left the home with I.A., she became concerned for I.A.'s safety. Specifically, she worried about the possibility of an accident. She also testified she was concerned about her brother's safety because she was under the impression that a group of neighbors, after hearing appellant left with I.A., was going to find him and beat him. She additionally testified she thought I.A. was crying when she returned with appellant because the commotion and the police presence at the residence. This testimony was simply perspectival. Because the thrust of her testimony was the expression of concern for both appellant and the victim, it is unclear what I.A.'s grandmother would be lying about. In this respect, we fail to see how the prosecutor's improper comment had any bearing on the jury's ability to fairly consider the evidence.

{¶49} Next, appellant cites the following comment by the prosecutor: "But when you go back and focus on reality, not fantasy land, not made-up land, not defense attorney land, and go to what really happened in this case, you're going to fill up this side of the column with - - you know what, that fact sounds like it, because it happened to her." The foregoing remark was made in relation to the defense's theory that the DNA evidence found in I.A.'s underwear may be a result of coincidental transference from appellant to the child or may be a different male's DNA altogether. Prior to making this statement, the prosecutor highlighted the DNA evidence demonstrating 24 out of 25 indicators in the sample matched appellant's profile. He further underscored the forensic testimony that the amount of the DNA found in the underwear would be inconsistent with a transfer.

{¶50} During closing argument, the state is afforded wide latitude to convincingly advance its strongest arguments and positions. *See State v. Phillips*, 74 Ohio St.3d 72, 90 (1995); still, the prosecutor must avoid going beyond the evidence presented in order to obtain a conviction. *See, e.g.*, *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). "[P]rosecutors must be diligent in their efforts to stay within the boundaries of acceptable argument and must refrain from the desire to make outlandish remarks, misstate evidence, or confuse legal concepts." *State v. Fears*, 86 Ohio St.3d 329, 332 (1999). While the prosecutor's comment was somewhat hyperbolic, it was made in the context of reviewing what the state's scientific evidence revealed and, albeit with some histrionics, essentially emphasized the logical maxim that possibility does not equate with probability. We see no error in the remark.

{¶51} Next, appellant references several allegedly problematic comments relating to appellant's pre-arrest silence. The remarks at issue occurred in the following argument:

{¶52} If you look at his half hour long video, we're supposed to believe that your great niece has accused you of inappropriate touching, that the Chief Detective of the Portage County Sheriff's Department is going to just tell you that. Tell you, well, she made some allegations. You heard about the other stuff. Yeah. She's now alleging that when you went to that park there was inappropriate touching. And you're gonna get this. I didn't touch her. No.

{¶53} If you're accused and it's your niece and the Detective uses the term inappropriate touching, would the more appropriate response be what did she say? What did she say I did? That never came out of his mouth.

{¶54} Your gotta look at that video and decide if that video lends corroboration to [I.A.] lied or because it happened to her. He doesn't even ask any questions of Detective Johnson about what she said. What's the theory? What inappropriate conduct did she say I did? He doesn't ask. Because he knows. It's not a hop, skip and a jump from there while he's sitting there all quiet.

{¶55} * * *

{¶56} No, he's sitting there quiet because his wheels are turning. His wheels are turning. * * * Like he said in the beginning, prove it. He's waiting to see what proof they have. That's why he's so quiet and that's why he never asks what does she say. That speaks volumes, too. His demeanor, the way he acted when he's notified, when he's told what it is, ask yourselves what column this fits under. Is it because [I.A.] lied or is it because it fits - - sounds like it happened.

{¶57} In support of his position, that the foregoing was involved improper commentary on his pre-arrest silence, appellant cites *State v. Leach,* 102 Ohio St.3d 135, 2004-Ohio-2147. In *Leach*, the defendant stated he wished to consult with an attorney prior to meeting with police. In its case-in-chief, the state presented testimony that the defendant, who had not yet been arrested or *Mirandized*, remained silent and asserted

17

his right to counsel. The Supreme Court concluded the testimony was clearly meant to permit the jury to infer the defendant's guilt. The Court held: The "[u]se of pre-arrest silence in the state's case-in-chief would force defendants either to permit the jury to infer guilt from their silence or surrender their right not to testify and take the stand to explain their prior silence." *Id.* at ¶31.

{¶58} In this case, appellant met willingly with police without invoking his right to counsel. Moreover, the prosecutor's comments were not obviously directed at appellant's pre-arrest silence. Indeed, appellant denied the allegations. Rather, the prosecutor's points relate more to appellant's demeanor and the arguable peculiarity of appellant's reticence. We discern no obvious error in the content of the prosecutor's remarks.

{¶59} Finally, appellant cites to the prosecutor's purported appeal to a "higher power." The prosecutor stated as follows: "And God bless Detective Johnson for doing what he does." And "Thank God he thought about saving those clothes." We fail to see how any reasonable person would conclude these statements are problematic. The use of the term "God" in these statements is idiomatic. They are interjections or commonly used expressions employed to express gratitude or relief. We perceive no error in the prosecutor's statements.

{¶60} Appellant's third assignment of error is without merit.

{¶61} "The trial court erred by admitting into evidence the statements made by I.A. to Melinda Andel. These statements were testimonial and violated Doak's Sixth Amendment right to confront and cross-examine the witnesses against him. It also violated Section 10, Article I of the Ohio Constitution."

18

{¶62} Under this assignment of error, appellant argues the trial court erred in admitting the CAC video of I.A.'s interview with Nurse Andel because, he claims, there was no applicable hearsay exception and its admission violated his right to confront I.A.

{¶63} Although found competent to testify after an in-camera hearing with the court, I.A. was not called to testify. Instead, the state submitted the video interview. A hearing was held, pursuant to *State v. Arnold*, *supra*, after which the trial court concluded that the out-of-court statements in the interview, while hearsay, were excepted, pursuant to Evid.R. 803(4), which provides:

{¶64} **Statements for Purposes of Medical Diagnosis or Treatment.** Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

{¶65} The trial court found I.A.'s statements were made for medical diagnosis and treatment, were non-testimonial, and thus were admissible without violation of Ohio's hearsay rule or the Confrontation Clause of the United States Constitution. In particular, the trial court determined:

{¶66} Ms. Andel testified that her purpose for conducting the interview was to gather information to protect the health and welfare of the child; to determine if she was at risk for further injury; to determine what, if any, physical tests and/or examinations need to be completed; whether or not there existed the possibility and need for testing for sexually transmitted diseases; and to accurately record the information to forward to the physician to minimize the number of interviews conducted which could further traumatize the child.

{¶67} This court has previously held that a de novo standard of review applies to determine whether evidence was inadmissible hearsay. *See Jack F. Neff Sand & Gravel, Inc. v. Great Lakes Crushing, Ltd.*, 11th Dist. Lake No. 2012-L-145, 2014-Ohio-2875, ¶23.

19

Here, there is no dispute that the evidence was hearsay; rather, the question is whether Evid.R. 803(4) applies to except the evidence from the rule excluding inadmissible hearsay. In concluding the exception applies, the trial court was required to evaluate facts and render factual determinations in order to arrive at its decision that I.A.'s statements were elicited for purposes of a medical diagnosis or treatment. Generally, an appellate court accepts a trial court's factual determinations if they are supported by competent, credible evidence. *See Willoughby v. Dunham*, 11th Dist. Lake No. 2010-L-068, 2011-Ohio-2586, ¶10.

{¶68} In *Arnold, supra*, the Supreme Court of Ohio specifically discussed forensic interviews conducted with sexual-abuse victims at child advocacy centers. The court concluded a social worker who interviewed a child was acting as an agent of the police while conducting interviews, and that under the "primary purpose" test, the interview's primary purpose was to further the state's investigation, not to meet an ongoing emergency. *Id.* at ¶35-36. As a result, some of the child's statements about the alleged crime, like descriptions of the defendant's genitals and the fact that the defendant had shut and locked a bedroom door before raping her, were testimonial in nature and their admission without prior ability for cross-examination violated the Confrontation Clause. *Id.* at ¶34. The court also held, however, that other statements elicited during the forensic examination, like the sexual acts the defendant performed, were non-testimonial and were admissible because they were necessary for medical diagnosis and treatment. *Id.* at ¶37-38 and 41.

{¶69} Here, it is unclear whether I.A. was referred to CAC by law enforcement or child protective services. There is nothing, however, that indicates Nurse Andel was

directly influenced or prompted by law enforcement to elicit information for purposes initiating or assisting in a criminal investigation. Nurse Andel testified that CAC has a multi-disciplinary team approach, which includes law enforcement, prosecution, mental health agencies, and children protective services; she additionally testified that CAC is a "child-friendly, neutral, safe place for children to come to talk about what might or might not have happened." She testified that her purpose as an interviewer of a potential child sex-abuse victim is to obtain information regarding the alleged abuse and, in light of this information, determine whether the child is medically healthy. She also emphasized that one of her goals is to make the child aware that he or she is safe and out of harm's way. She testified she is trained to elicit information from a victim by asking non-leading and non-threatening questions. If the child is responsive and he or she provides details of the abuse (or even if there is suspicion that abuse occurred), the Nurse, in conjunction with Dr. McPherson, conducts a physical examination to determine whether the child has any physical injuries or sexually transmitted infections or diseases.

{¶70} It is additionally worth noting that the interview was *not* conducted based upon the underlying allegation against appellant; rather, I.A. was being interviewed at CAC for allegations of sexual conduct which allegedly occurred between I.A. and her step brother in Summit County. In the course of discussing the details of that incident, I.A. spontaneously volunteered information relating to the underlying incident, which involved an adult family member. This disclosure prompted additional concerns regarding I.A.'s physical and emotional well-being because the initial allegations involved other children, which Nurse Andel noted could be, from I.A.'s young perspective, viewed as more of a game. The underlying allegation, however, focused upon an adult family member, a

21

person of potential authority and greater influence. These points, in conjunction with the potential for more significant physical harm due to the size disparity, triggered additional concerns for I.A.'s medico-psychological health.

{¶71} In light of the testimony as well as the content of the interview and the manner in which Nurse Andel conducted the same, we conclude there is competent, credible evidence to support the trial court's conclusion that the primary purpose of the interaction was for medical diagnosis and treatment.

{¶72} Appellant's fourth assignment of error lacks merit.

{¶73} Although our disposition of appellant's fourth assignment of error concludes our analysis as it pertains to the matters raised in his brief, a review of the record demonstrates two additional issues must be addressed sua sponte. First, the judgment on sentence must be reversed because the court merged the two counts, yet proceeded to sentencing on each count.

{¶74} In *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, the Ohio Supreme Court stated:

{¶75} R.C. 2941.25(A)[, Ohio's merger statute,] clearly provides that there may be only *one conviction* for allied offenses of similar import. Because a defendant may be convicted of only one offense for such conduct, the defendant may be sentenced for only one offense. This court has previously said that allied offenses of similar import are to be merged at sentencing. See *State v. Brown,* 119 Ohio St.3d 447, 2008-Ohio-4569, ¶43; *State v. McGuire* (1997), 80 Ohio St.3d 390. Thus, a trial court is prohibited from imposing individual sentences for counts that constitute allied offenses of similar import. *Underwood, supra,* at ¶26.

{¶76} In this case, the state acknowledged at the sentencing hearing that the counts should be merged. As indicated in our analysis of appellant's first and second assignments of error, the prosecutor outlined the sentencing options for the rape count,

22

but did not discuss a sentence for the gross sexual imposition count. We consequently concluded this operated as an election on the rape count. Notwithstanding the court's agreement that the counts must merge, it nevertheless sentenced appellant on both, imposed a five-year term of imprisonment for the gross sexual imposition, and ordered the counts to be served concurrently. This was error. Accordingly, the case must be reversed and remanded for resentencing.

{¶77} Moreover, the trial court erred by not imposing post-release control and by failing to provide notifications contained in R.C. 2929.19(B)(2)(c) and (e). At the time appellant was originally sentenced, R.C. 2967.28(B) provided: "Each sentence to a prison term for a felony of the first degree * * * shall include a requirement that the offender be subject to a period of post-release control imposed by the parole board after the offender's release from imprisonment." The law has since been amended by S.B. 201, effective March 21, 2019, and now does not require such advisements to defendants sentenced to a term of life imprisonment. The change in law, however, does not apply to this case because S.B. 201 applies to all first-and second-degree felonies committed on or after that date. Accordingly, the trial court was required to impose and provide the requisite advisements. *See State v. Peace*, 11th Dist. Portage No. 2017-P-0037, 2018-Ohio-3742, ¶32 citing *State ex rel. Carnail v. McCormick*, 126 Ohio St.3d 124, 2010-Ohio-2671, ¶20 ("Upon sentencing a defendant, a court must impose post-release control for first-degree felonies and felony sex offenses even when the sentence is life in prison without parole.") Its failure to do so was error.

{¶78} For the reasons discussed in this opinion, the judgment of the Portage County Court of Common Pleas is affirmed in part, reversed in part, and remanded for resentencing.


MARY JANE TRAPP, J., concurs,

TIMOTHY P. CANNON, P.J., concurs with a Concurring Opinion.

_____


TIMOTHY P. CANNON, P.J., concurring.

{¶79} I respectfully concur in the judgment but write to clarify a point with regard to the fourth assignment of error. As noted, the fourth assignment of error addresses the hearsay statements of the victim made during a video interview by the nurse. The assigned error also alleges a violation of the Sixth Amendment right to confront and cross-examine witnesses. In the body of the brief, however, appellant essentially only argues the hearsay aspect of the statements.

{¶80} Defense counsel objected to the use of the video statements at trial. A motion was made, and the defense argued: "It is our position * * * that what she says on that videotape is testimonial and it would be improper to allow that unless I have the opportunity to cross-examine her." The trial court properly conducted a hearing outside the presence of the jury and did two things. First, it allowed the nurse to testify regarding the purpose of the video interview. Second, the trial court interviewed the seven-year-old victim and determined that she was competent to testify. Thus, it appears the state was intending to call the victim to testify. At the conclusion of the hearing, the defense argued the statements were "testimonial in nature and they should be left out unless I have the

24

ability to cross-examine her." I agree with the majority that we must defer to the trial court's factual findings as to whether the statements were testimonial.

{¶81} I write separately about the portion of the fourth assignment of error that addresses the Sixth Amendment right to confront and cross-examine. At trial, while the defense objected to the admission of the video statement, the record does not indicate that the defense requested to cross-examine the victim. This may well have been trial strategy, as the defense may not have wanted this seven-year-old victim to testify live before the jury. Because there was no request at trial to make the victim available for cross-examination, we do not reach a conclusion here about whether appellant should have been permitted to do so.